# PATTON v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

No. 36. Argued October 16, 1895. — Decided November 11, 1895.

The plaintiffs in error imported into the port of New York in November, 1888, a quantity of wool which had been scoured; which was then put upon a comb from which it came in long lengths known as slivers or slubbing; which was then put through a process called gilling, which formed the slivers into a less number of slivers of greater thickness; and which was then taken into the drawing room and finished, from whence it came out in the form of round balls called tops. The collector first classed the goods as waste, and fixed the duty at ten cents a pound under the act of March 3, 1883, c. 121, 22 Stat. 488, which duty was paid; but subsequently the collector imposed on the whole importation, under the same act, a duty of ten cents a pound as wool of the first class, costing under thirty cents per pound in the unwashed condition; then trebled that duty, because imported scoured; and then doubled the result upon the ground that the tops had been changed in their character or condition for the purpose of evading the duty. The importer declined to pay the excess of duty so imposed, and the United States commenced this action to recover it. *Held*, That the duty of sixty cents a pound was properly imposed, and that there was no error in the rulings of the trial court which are set forth in the opinion of this court.

THIS was an action by the United States in the District Court against the importing firm of George W. Patton & Co. to recover certain duties claimed to be due on thirty-three bales of merchandise entered by the importers as "wool waste," and claimed by them to be dutiable at ten cents per pound under the following clause of schedule K of the tariff act of 1883: "Woollen rags, shoddy, mungo, waste, and flocks, ten cents per pound." At the time of the importation (November, 1888) the duties were accordingly assessed and paid at this rate.

The appraiser subsequently returned the goods as "scoured wool, broken tops, class 1, costing under thirty cents per pound in the unwashed condition, sixty cents per pound." The collector accordingly fixed the duty at sixty cents per

pound, under the following paragraphs of the act of March 3, 1883, c. 121, 22 Stat. 488, 508.

"All wools . . . shall be divided, for the purpose of fixing the duties to be charged thereon, into the three following classes :

"Class one, clothing wools — that is to say, merino . . . wools," etc.

"The duty on wools of the first class which shall be imported washed shall be twice the amount of the duty to which they would be subjected if imported unwashed; and the duty on wools of all classes which shall be imported scoured shall be three times the duty to which they would be subjected if imported unwashed."

"The duty upon wool . . . which shall be imported in any other than ordinary condition, as now and heretofore practised, or which shall be changed in its character or condition for the purpose of evading the duty . . . shall be twice the duty to which it would be otherwise subject."

The collector first imposed a duty of ten cents a pound upon this as wool of the first class, costing under thirty cents per pound in the unwashed condition, then trebled this duty, because they were imported scoured, and again doubled the result upon the ground that they had been changed in their character or condition for the purpose of evading the duty. This made the aggregate duty sixty cents per pound, which appears to have been greater than the whole value of the goods. To recover the difference paid upon the entry and the duty imposed by the collector, the United States brought this suit.

Upon trial before a jury, the court charged that the importation in question could not be considered as wool waste, as it did not consist of refuse or broken particles thrown off in the process of manufacture, and was made intentionally by tearing up what are called "wool tops," which consist of wool which has been subjected to several processes, and prepared for spinning; and that it could not be considered as a manufacture of wool; and hence the court left it to the jury to say whether the wool was imported scoured, and in a condition other than that in which such wool was customarily imported in March,

1883, and previously. The court expressed the opinion that the plaintiff was entitled to recover the amount of the duties assessed, but submitted the case to the jury upon the evidence.

The jury found a general verdict for the plaintiff in the sum of $10,887.26, and further found, in answer to a special question submitted to them by agreement, " that the tops which were broken into fragments constituting this importation were so broken for the purpose of changing the condition of the wool from tops into the fragments resembling waste, for the purpose of evading the duty to which the wool in the form of tops would be subjected on importation into this country, or evading duty to which the importers believed the tops would be liable."

Judgment having been entered upon this verdict, defendant sued out a writ of error from the Circuit Court of the United States, which affirmed the judgment of the court below. Defendants thereupon sued out a writ of error from this court.

*Mr. Frank P. Prichard,* (with whom was *Mr. John G. Johnson* on the brief,) for plaintiffs in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. The first assignment of error is that which is taken to the instruction to the jury that the importation in question, though called wool waste, seems to be so called only because of its resemblance to what was formerly known by this designation ; that it does not consist of refuse or broken particles thrown off in the process of manufacture, but is made intentionally, by tearing up what are called " wool tops," which consist of wool which has been put through several processes and prepared for spinning, and that the term " waste " did not embrace this commodity.

The correctness of this instruction turns upon the meaning

of the words "woollen waste," as used in the act of 1883. As bearing upon this, we are at liberty to consider its ordinary definition, which will be controlling, except so far as it may be varied by a commercial designation obtaining at that time. *Saltonstall* v. *Wiebusch,* 156 U. S. 601. *Waste* is defined by Webster as "that which is of no value; worthless remnants; refuse. Specifically: remnants of cops, or other refuse resulting from the working of cotton, wool, hemp, and the like, used for wiping machinery; absorbing oil in the axle boxes of railroad cars, etc." In this connection, and in the same clause of the statute, other words are included, undoubtedly referring to articles of the same or of a similar nature. These are "*rags; shoddy,*" defined as "a fibrous material, obtained by 'devilling' or tearing into fibres, refuse woollen goods, old stockings, rags, druggets, etc.;" "*mungo,*" which properly signifies the disintegrated rags of woollen cloth, as distinguished from those of worsted, which form shoddy; and "*flocks,*" defined as "woollen or cotton refuse, old rags, etc., reduced to a degree of fineness by machinery, and used for stuffing upholstered furniture;" and also as "very fine sifted woollen refuse, especially that from shearing the nap of cloths, used as a coating for wall paper to give it a velvety or cloth-like appearance." The prominent characteristic running through all these definitions is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

The importation in question consisted of wool which had been scoured, then carded and prepared; then put upon a comb, from which it comes in long lengths, known as slivers or slubbing. It is then put through a process called gilling, which forms the slivers into a less number of slivers of greater thickness. These slivers are then taken into the drawing room and finished, from whence they come out in the form of round balls, called "tops." These tops become new articles of merchandise, which are sold to the spinners, who spin them into worsted yarn.

In the process of making the tops, short ends of wool are produced, which are called, and sold in the trade as "Botany laps" or "Botany waste," the two terms being synonymous in the English market. After the top is produced, it sometimes happens that it is shorter in staple than was anticipated, or not of the proper color, or that it has to be recarded to get out the burrs, or for some other reason it becomes unmerchantable. In such cases, it has always been the practice in England to break up the tops as unfit for ordinary use, and in that condition they are sold for the same purpose as wool waste, and are known and sold commercially as Botany laps or Botany waste. It was not claimed, however, that they formed a recognized article of commerce in this country, or to any great extent in England. At and prior to 1883, there was no quotable market price for waste, for the reason that the manufacture was not large, though it was bought and sold to a certain extent on its merits upon the market.

In 1887 or 1888, owing to the depression of the wool trade in England, and the demand for waste in this country, the price of tops became so low and the price of waste so high, that the deliberate breaking up of tops began for the purpose of exporting them to America as waste, though there is no evidence of any importation of this character prior to 1887. The discovery that the tops thus broken up might be entered at the American custom-houses as "waste" produced such a sudden demand for exportation that, while the amount declared at the American consulate at Bradford, the centre of this trade, for the last two months of 1887, and the first two months of 1888, was only 190,088 pounds, for the corresponding months of 1888 and 1889 it rose to 1,803,558 pounds.

It appeared from the evidence that the waste, whether intentionally· or unintentionally produced, was an article having different qualities from the merchantable wool, and was used as an adulterant. It is, however, used like other scoured wool, being mixed with it in the carding machine, and is worth only ten or fifteen cents less per pound than

scoured wool of the same character; and hence, in view of the difference in tariff rates, is an article of much more value than scoured wool for the purposes of importation. While these broken tops became a large import under the designation of waste, they never seem to have been prepared in this country for the purposes of sale, the tops being much more valuable in their unbroken condition; while in England, in 1888, the broken tops were more valuable than the unbroken ones. The testimony upon both sides indicates that this artificial kind of waste is, for obvious reasons, more uniform and clean, and, therefore, more valuable than genuine waste. It was not disputed that the importations in question consisted of tops deliberately broken up for the purposes of sale. The main question is whether the action of the collector was correct in refusing to allow them to be entered under the denomination of "waste."

If the ordinary definition of "waste," as refuse matter thrown off in the process of manufacture, is to control, it is quite clear that the importations in question are not susceptible of this meaning. The common definition of "waste" lends no support to the theory of the defendants.

With regard to its commercial designation there was undoubtedly some testimony tending to show that, in England, merchantable tops broken up for the purpose of exportation had acquired the commercial designation of waste, or more properly, "broken top waste;" that the importations in question were ordered by the defendants under the latter designation, and that such waste was preferred to the ordinary waste or refuse, because the latter had too much slubbing. This designation, however, was confined to such waste as had been purchased since 1887, and threw no light upon the commercial designation of the article in question at or prior to March, 1883. There is little or nothing to indicate that the practice of breaking up merchantable tops for export prevailed in England prior to 1887, when the attention of wool dealers there seems to have been called to the profits that could be made by exporting broken tops to America. There were, however, several witnesses produced by the defence, who were

residents of the United States, and who swore that the article in question had been known in this country as top waste since 1866, and that there was no difference in the commercial designation of the article, whether it was intentionally · or unintentionally produced.

This must, however, be taken in connection with the undisputed testimony that merchantable tops had never been broken up in England to form waste prior to 1887 or 1888, when the attention of dealers was first directed to the profits which could be made by importing them into this country under that denomination. The witnesses upon cross-examination admitted that they had never known of merchantable tops being broken up and imported here as waste prior to 1887, and their testimony, so far as it bears upon preceding years, indicates that the top waste referred to was that produced by the breaking up of discolored or otherwise unmerchantable tops, the product of which was known commercially and properly as waste or top waste. In short, the testimony upon this subject falls far short of establishing a commercial designation applicable to these articles with the certainty, uniformity, and generality required by the decisions of this court. *Maddock* v. *Magone,* 152 U. S. 368, 371 ; *Berbecker* v. *Robertson,* 152 U. S. 373, 377 ; *Sonn* v. *Magone,* 159 U. S. 417. In default of such evidence, the term will be presumed to have been used in the tariff act in its ordinary sense of refuse. *Swan* v. *Arthur,* 103 U. S. 597 ; *Schmieder* v. *Barney,* 113 U. S. 645. Taking the testimony all together, we think there was no such evidence of a commercial designation of the articles in question as made it incumbent upon the court to submit the question to the jury.

But had the evidence upon this point been much stronger than it was, it is difficult to see how it could avail the defendant in view of the clause that " the duty upon wool . . . which shall be imported in any other than ordinary condition, as now or heretofore practised, or which shall be changed in its character or condition for the purpose of evading the duty . . . shall pay twice the duty to which it would otherwise be subject." Although it was submitted as a separate question

to the jury, the testimony was practically undisputed, that the articles in question were merchantable tops broken up for the purpose of changing their character or condition from that of tops to that of waste, and that it was done for the purpose of evading the duty to which the wool in the form of tops would be subject on importation, or, at least, to which the importer believed it would be liable. If such change were made, and made for this purpose, it would make no difference whether the article thus produced was known commercially as waste or not. Assuming that the product would be waste, it would be waste produced by a process which Congress had refused to recognize, and the fact that the classification of the article was thereby changed would not relieve it from the double duty which Congress had imposed upon wool whose character or condition had been changed.

In this connection, we are referred by counsel for defendants to two cases which are supposed to justify the inference that imported merchandise may be treated in such manner as to change its classification, even though such change were made for the purpose of securing its importation at a lower rate of duty. In the first of these cases, *Merritt* v. *Walsh*, 104 U. S. 694, certain sugars were given an artificial color in the process of manufacture. The sole test of their dutiable quality was their actual color, as graded by the Dutch standard. It had been decided that this meant the color of the sugar obtained by the ordinary process of manufacture, and that any means used to degrade the color after such process was a fraud upon the revenue. As no proof was offered to show that they were artificially colored after the manufacture was completed, the court instructed the jury to find a verdict for the plaintiffs. The real question was whether (supposing that sugars were not artificially colored for the purpose of avoiding duties after being manufactured) their dutiable quality was to be decided by their actual color or by their saccharine strength. It was decided that as the Dutch standard was a color standard only, even if the sugars had been manufactured in dark colors on purpose to evade our duties, the entry at a reduced value was nevertheless lawful, and that the remedy lay with Congress alone.

In the second case, *Seeberger* v. *Farwell*, 139 U. S. 608, 611, this court held that certain manufactures of wool, into which a few threads of cotton had been introduced for the purpose of securing the classification of the goods at a lower rate of duty, were properly subject to classification at that rate, although the quantity of cotton was so small as not to materially change the character of the goods as merchandise, the court observing that "Congress having made special provision for a lower rate of duty upon goods when composed in part of wool, without naming how much of other material should enter into their composition in order to secure such lower rate of duty, the court was of opinion that manufacturers and importers had a right to adjust themselves to the foregoing clause of the tariff, and to manufacture the goods with only a small percentage of cotton, for the purpose of making them dutiable at the lower rate." In those cases, however, there was no such provision applicable to sugars or to woollen cloths as exists in this case, providing that where wool unmanufactured shall be changed in its character or condition for the purpose of evading duty a double duty shall be imposed. The object of this legislation seems to have been to make that unlawful with respect to raw wools which had been held to be legitimate with respect to other articles.

2. We are also of opinion that the importations in question cannot be considered as manufactures of wool. Assuming that the tops, before being broken up, represented a stage in the process of converting the wool into cloth, which would entitle them to be considered as manufactures; if the tops be reconverted into wool, so that the process has to be gone through with again, the wool loses its character as a manufacture and resumes its character as wool, even though it acquires the new commercial designation of waste. Waste in its ordinary sense being merely refuse thrown off in the process of converting raw wool into a manufacture of wool, cannot be considered a manufacture simply because it acquires a new designation, and if it be artificially produced by the breaking up of the tops it is with even less reason entitled to be so considered. Unless natural waste can be treated as a manufacture, artificial waste should not.

The clause in the tariff act covering these manufactures imposed both a specific and an *ad valorem* duty upon "woollen cloths, woollen shawls, and all manufactures of wool of every description." Applying the rule *noscitur a sociis*, it can hardly be supposed that wool, used for the purpose of waste and as an adulterant in the manufacture of cloths, was to be included in the same designation as woollen cloths and shawls, which evidently refer to articles made of wool and having a separate designation of their own. But however this may be, the article in question does not fall within the definition of manufactures as laid down by this court in numerous cases. Thus, in *United States* v. *Potts*, 5 Cranch, 284, round copper bottoms turned up at the edge, not imported for use in the form in which they were imported, but designed to be worked up into vessels, were held not to be manufactured copper within the intention of the legislature. So, in *Hartranft* v. *Wiegmann*, 121 U. S. 609, shells cleaned by acid, and then ground on an emery wheel, and some of them afterwards etched by acid, and intended to be sold for ornaments, as shells, were held to be "shells" and not "manufactures of shell." The question is fully discussed in *Lawrence* v. *Allen*, 7 How. 785, in which, however, it was held that india rubber shoes made in Brazil, by simply allowing the sap of the india rubber trees to harden upon a form, were manufactured articles because they were capable of use in that shape as shoes. Indeed, this was the form in which such shoes were at first made. Finally, in *Seeberger* v. *Castro*, 153 U. S. 32, tobacco scrap consisting of clippings from the ends of cigars and pieces broken from tobacco, of which cigars are made in the process of such manufacture, not being fit for use in the condition in which they are imported, were held to be subject to duty as unmanufactured tobacco. This scrap is in the nature of waste, and the case is directly in point.

3. The remaining assignment is as to the charge of the court that, if this wool was imported scoured, and in condition other than that in which such wool was customarily imported in March, 1883, and previously, it fell within the provision of wool imported scoured. There is abundance of testimony to

the effect that the article imported was not known commer-
cially as "scoured wool;" but in the view taken by the court
below, which we think was correct, this was immaterial.
The act does not impose a duty upon scoured wool as such by
its commercial designation, but provides that "the duty on
wools . . . which shall be imported washed, shall be twice
the amount of duty to which they would be subject if im-.
ported unwashed; and the duty on wools of all classes which
shall be imported scoured, shall be three times the duty to
which they would be subjected if imported unwashed." In
short, the act refers not to the commercial designation but
to the fact whether the wool has been actually scoured or
washed, or is imported unwashed. If the wools have in fact
undergone the process of scouring, they are properly classified
as imported scoured, although they may not be known com-
mercially as scoured wools.

There was no error in the rulings of the court below, of
which the defendants were entitled to complain, and the judg-
ment of the court below is, therefore,

                                        *Affirmed.*