OVERTON & Co. *v.* UNITED STATES (No. 1115).[1]

1. JUTE AND JUTE BUTTS.

The terms "jute" and "jute butts" are not used without qualification by the trade in the buying and selling of jute; and, consequently, those terms, standing by themselves, can not have been given by the trade a special commercial signification that excluded jute waste or any class of jute fiber available for textile uses.

2. JUTE WASTE STILL JUTE OR JUTE BUTTS.

Goods more than 98 per cent jute are to be regarded as articles composed of jute, and an insignificant percentage of material other than jute found to be present on analysis of bagging did not exclude the goods from the operation of paragraph 355, tariff act of 1909.

United States Court of Customs Appeals, March 25, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7447 (T. D. 33277).

[Affirmed.]

*Brown & Gerry* for appellants.

*William L. Wemple,* Assistant Attorney General, for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Certain merchandise imported at the port of New York was returned by the appraiser as bagging for cotton and was assessed for duty by the collector of customs at six-tenths of 1 cent per square yard under the provisions of paragraph 355 of the tariff act of 1909, which said paragraph reads as follows:

355. Bagging for cotton, gunny cloth, and similar fabrics, suitable for covering cotton, composed of single yarns made of jute, jute butts, or hemp, not bleached, dyed,

---

[1] Reported in T. D. 34322 (26 Treas. Dec., 541).

colored, stained, painted, or printed, not exceeding 16 threads to the square inch, counting the warp and filling, and weighing not less than 15 ounces per square yard, six-tenths of 1 cent per square yard.

The importers protested that the bagging for cotton was not composed of single yarns made of jute, jute butts, or hemp, but that the goods were either manufactures of other vegetable fiber, dutiable at 45 per cent ad valorem under the provisions of paragraph 358 or manufactures not enumerated or provided for, dutiable at 20 per cent ad valorem under the provisions of paragraph 480. The paragraphs relied upon by the importers read as follows:

358. All woven articles, finished or unfinished, and all manufactures of flax, hemp, ramie, or other vegetable fiber, or of which these substances, or any of them, is the component material of chief value, not specially provided for in this section, 45 per centum ad valorem.

480. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles, not enumerated or provided for in this section, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not provided for in this section, a duty of 20 per centum ad valorem.

The Board of General Appraisers overruled the protest and the importers appealed. It appears from the report of the appraiser that the importation in controversy consists of five rolls of bagging for covering cotton and that the merchandise is made entirely of jute waste. Jute waste has its origin in a plant called "jute," which is produced extensively in India for its fiber. To secure the best results, according to the standard authorities, the plant is harvested when in flower. If harvested earlier the fiber is weak, and if harvested after the plant has gone to seed the fiber, though heavy and strong, is harsh, woody, and wanting in gloss. The plant, when ready to be processed, is cut off a few inches above the root or pulled up by the roots and, after being tied in bundles, is steeped in water in order to loosen the bark from the stalk and rot the cellular matter binding the fibers together. The bark is then pulled off the stalk from root end to tip and dashed repeatedly against the surface of the water to separate the fibers from the inclosing tissue. The separated filament consists of two classes of fiber, one fine and glossy, which comes from the upper part of the plant, and the other coarse and woody, which is stripped from the lower part of the stalk.

On the hearing before the board, the Government made no appearance and introduced no evidence. On the part of the importers eight witnesses were called, who testified that the fine, glossy filament of the jute plant was known as jute and the coarser woody fiber as jute butts. According to the witness Fleming, the textile material of the fabric in question is all jute waste with the exception of 1.775 per cent, which is nonjute waste. From the testimony relied on by appellants it further developed that there is a kind of jute fiber designated as jute rejections. Jute rejections, as appears from the sample, are uncut lengths of the fiber, and therefore partake of the

qualities both of jute and jute butts, inasmuch as part of the fiber is fine and part of it woody. Jute rejections, however, as disclosed by the samples, are lacking in gloss, have a bad color, and are seemingly not up to the mark in textile strength. From this it is apparent that jute, jute butts, and jute rejections are all jute fiber, the product of the jute plant, and that they are designated by different names, not because they are different fibers, but different classes of the same fiber.

The merchandise under discussion is admittedly composed almost wholly of jute waste thrown off in the process of the manufacture and weaving of jute yarns. Jute waste is in truth and in fact broken, short, and split lengths of jute fiber, which are coarse or fine according to the grade of the fiber from which the waste was thrown off in the process of manufacture, and oily, soiled, or fairly clean, according to the place in the mill or factory from which the waste was gathered or swept up. Jute waste is not a waste in the sense that it is a by-product unfitted for any of the uses for which jute may be employed. On the contrary, as appears from the evidence, with a long fiber to carry it along, and even without such long fiber, jute waste may be spun by special machinery and woven into fabrics just as is the fiber from which it was thrown off. True, the fabric may be inferior in quality to that manufactured out of the longer, better, and stronger filament. Nevertheless, the fact remains that the waste is still fitted to be used as a jute fiber, and that it can be so used is demonstrated by the fact that in this case it was, without the assistance of any long fiber save that of dirty jute yarn waste, converted into bagging for cotton, the very commodity, by the way, which first brought jute into prominence and for the making of which commodity all jute was originally exclusively used by European spinners and weavers. To the common understanding, therefore, jute waste is jute fiber, and a fabric made out of jute waste, whether bagging or anything else, would, in popular parlance, be denominated a manufacture of jute.

The importers, however, contend that the tariff designations "jute" and "jute butts" have a general, uniform, and definite meaning in the trade which excludes jute waste, and that therefore the cotton bagging here in question can not be classified as composed of single yarns made of jute or jute butts within the meaning of paragraph 355. In support of this contention the importers' witnesses testified that all fibers were divided into two general classes, hard and soft, and that jute was ranked with flax and hemp as a soft fiber; that jute fiber was divided into three grades—jute, jute butts, and jute rejections—and that each of these grades was recognized by the trade as a separate and different article; that a delivery of jute would not be regarded as a good delivery of jute butts, and that jute butts would not be regarded as a good delivery of jute, and that jute rejections

would not be accepted on an order for jute or jute butts; that there are different grades of jute, different grades of jute butts, and different grades of jute rejections, and that in ordering jute or jute butts or jute rejections the grade wanted must be designated; that jute rejections is a kind of jute fiber from which the butts have not been cut *and is an inferior quality of jute;* that jute is worth about 5 cents per pound and jute butts about 3 cents a pound; that dealing in waste is a distinct business by itself, although some merchants dealing in fibers handle fiber waste also; that the jute wastes resulting from carding, roving, and weaving the jute are known as card waste, roving waste, and caddis or loom waste; that if any of these wastes is stained with oil it is known as oily waste; that jute waste is jute fiber, but not jute; that in the trade the several kinds of jute waste are separate and distinct articles of commerce, which are bought and sold under different names and vary in price from 30 cents to $3 per 100 pounds; that the jute wastes used in the manufacture of the merchandise under consideration contained some jute butts and were worth from 30 cents to 75 cents per 100 pounds.

Carefully analyzed, the evidence submitted to the board in support of commercial designation amounts to nothing more than that jute fiber is divided by the trade into two general classes, jute and jute butts, and that each of these classes is in its turn subdivided into as many grades as the convenience of business or the color, fineness, length, appearance, tensile strength, or other characteristics of the fiber may require.   True, the witnesses for the importer are all agreed that jute, jute butts, jute rejections, and jute waste are recognized by the trade as different and distinct commodities and that on an order for one class of jute fiber the delivery of another would not be accepted as a good delivery.   This testimony, however, loses all its weight when considered in conjunction with other testimony to the effect that jute rejections and jute waste, as well as jute and jute butts, are graded, and that in giving orders for jute fiber the grade wanted must be specified.   Naturally if a certain particular kind of jute fiber is ordered the delivery of another grade, kind, or class would not be a good delivery, but from that it can hardly be deduced that a commercial meaning has been given to jute or jute butts which does not embrace jute waste.   In other words, inasmuch as jute, jute butts, jute rejections, and jute waste are never ordered by the trade under those names alone, but by designations indicating the grade desired, it follows not only that the delivery of one grade would never satisfy an order for another grade, *but also that the terms "jute" and "jute butts" are not used without qualification by the trade in the buying and selling of jute, and that consequently those terms, standing by themselves, could not have been given by the trade a special commercial signification which excluded jute waste or any class of jute fiber available for textile uses.*

If the jute waste in this case had been of such a character that it was no longer susceptible of any of the textile uses to which jute fibers are devoted or was unmerchantable for any of the purposes for which merchantable jute fiber was peculiarly suitable it might be contended with some degree of reason that this commodity was not jute, but a true waste within the common, ordinary meaning of that term. Salomon Bros. & Co. *v.* United States (2 Ct. Cust. Appls., 431; T. D. 32196); Patton *v.* United States (159 U. S., 500, 501–505); Latimer *v.* United States (223 U. S., 501–504). Such is not the situation here, however, inasmuch as the so-called jute waste was not only available, but actually employed in the manufacture of bagging for cotton, a use to which all jute was originally principally applied. Moreover, if bagging for cotton made of a jute fiber which is denominated jute waste be excluded from the operation of paragraph 355, then apparently such bagging would become dutiable at 45 per cent ad valorem as a woven article or manufacture of "other vegetable fiber," under the provisions of paragraph 358, and that would mean that the bagging in question would be subjected to a duty of more than $3\frac{1}{3}$ cents a square yard or more than five times the duty imposed on bagging made of first-class jute. Such a result would imply a legislative intent to subject manufactures of inferior jute fiber to a much higher rate of duty than manufactures of superior jute—a plain violation of the policy which usually obtains in the preparation and passage of tariff acts, and therefore a result which we can not assume was intended by the Congress, in the absence of anything in the law or the record, to warrant such an assumption.

In our opinion, the jute waste under discussion was, at the time of its conversion into the goods imported, true jute fiber, capable of being spun and woven, and therefore entitled to be regarded as a grade of jute or jute butts. Indeed, if the jute rejections, which partake of the qualities both of jute and jute butts, and are sometimes "not half as good" as jute waste, may be considered as a grade of jute, it is not apparent just why jute waste can not be similarly classified.

The point made that the goods are not made wholly of jute, but in part of seg waste, cotton waste, and hard fiber waste, is not well taken. The amount of seg, cotton, and hard fiber waste in the fabric was less than 2 per cent, and the goods were substantially of jute. Goods more than 98 per cent jute are to be regarded as articles composed of jute, and we must therefore hold that the insignificant percentage of material other than jute found on analysis of the bagging did not exclude that article from the operation of paragraph 355. United States *v.* Burne (4 Ct. Cust. Appls., 298; T. D. 33515); Swan *v.* Arthur (103 U. S., 597–598; Arthur's Executors *v.* Butterfield (125 U. S., 70, 74–75).

The decision of the Board of General Appraisers is *affirmed.*