T. E. ASH *v.* UNITED STATES (No. 3035[1])

United States Court of Customs Appeals, June 11, 1928

J. P. Markham, jr., for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*Philip Stein* and *Fred J. Carter*, special attorneys, of counsel), for the United States.

[1] T. D. 42838.

226

Before Graham, Presiding Judge, and Smith, Barber, Bland, and Hatfield, Associate Judges

Smith, Judge, delivered the opinion of the court:

Old bagging, imported at Houston, Tex., was classified by the collector as bags made of jute and assessed for duty at 1 cent per pound and 10 per centum ad valorem under that part of paragraph 1018 which reads as follows:

1018. Bags or sacks made from plain woven fabrics of single jute yarns or from twilled or other fabrics composed wholly of jute, not bleached, printed, stenciled, painted, dyed, colored, nor rendered noninflammable, 1 cent per pound and 10 per centum ad valorem; * * *

The importer protested that the bagging was waste bagging or waste sugar sackcloth and that it was therefore entitled to free entry under the provisions of section 201 and paragraph 1516 of the Tariff Act of 1922, the pertinent parts of which read as follows:

Sec. 201. That on and after the day following the passage of this act * * * the articles mentioned in the following paragraphs, when imported into the United States * * * shall be exempt from duty:

1516. Waste bagging, and waste sugar sackcloth.

The United States Customs Court overruled the protest and the importer appealed.

On the hearing before the United States Customs Court Fred Renaud testified on behalf of the importer that he was superintendent of the Southern Bag & Burlap Co., which was engaged in the business of manufacturing bags and patches; that he had been engaged in the bag business at different periods for about seven years; that he had dealt in material such as the bagging imported many times and had used materials of that kind for the making of cotton patches, technically known as the three or four pound cotton patch; that the official sample was an Australian wool tare and that it was *incapable of being made into anything except patches for cotton;* that the wool tares were cut into strips, and that after sewing the ends together the strips were cut into cotton patches about 48 inches in length; that the bagging imported was originally used for covering bales of wool and that when torn off or cut off the wool bales to remove the wool, the bagging was known as wool tares; that the witness never knew of wool tares being used as bags; that the witness had experience with bags of all descriptions and that he never knew material of the kind imported to be used as bags; *that if the splits on the sides of the bags imported were sewed up, it would be a bag;* that it would not be recognized as a bag in commercial parlance inasmuch as it is shaped exactly like a box and has an entirely different shape from the average bag; *that the sample in the condition in which it was imported could not be used as a bag and could not be used as a container in its imported con-*

*dition;* that if the holes in the bottom were patched it could be used as a container; that all bags answer the purpose of covering but that for various reasons the sizes for bags are fixed; that a bag may be long, oblong, or square, and would hold anything put in it without regard to its size. At this point attorney for the importer asked the witness the following question:

Q. State whether anything had to be done to make these bags usable.

The Government objected to the question on the ground that it related to something that had happened after the importation. The objection was sustained and to that ruling the importer excepted.

The witness stated that he had examined hundreds of the bags on arrival of the shipment; that they had been cut open with a knife and split down the sides; that the bags containing the original stuff are cut and slashed to dump the contents; that sometimes for that purpose the whole top was cut off and sometimes pieces were cut open just large enough to let out the wool; that the wool tares were made originally to hold wool and that they are a type of bagging entirely different from that used in this country; that many of the bags were cut in all sorts of ways and in some instances the material had to be thrown away or used as filler for other packages because of the cutting and slashing; that the official sample is not the average type of bag contained in the shipment and is a much better bag than those from which it was selected but that "outside of the split" it was a good sample of the shipment.

M. R. Quarles testified on behalf of the importer that he was factory superintendent of the Seaboard Bag Co. and that he had been engaged in the bag business for seven years; that the official sample was an Australian wool tare and was used to export wool from Australia into England; that wool tares are used for cotton patches, *and that in all his experience the witness knew of no other use for Australian wool tares;* that the official sample could be "treated or repaired" so as to make it usable as a container for wool in America but that it was not so used and that it would not be practicable from a financial point of view to use it; that to make a complete bag out of the article, it would have to be sewn up and a top put on it; that it was *possible* to use the sample as a wool tare, but that so far as the witness knew, wool tares were not used more than once and that the sample had been already used.

C. F. Palmer, called as a witness for the Government, testified that he was in charge of the Federal Bureau of Animal Industry in Houston; that he had occasion to pass upon and examine merchandise similar to the official sample; that he had been handling bags or bags *similar to the official sample for about one year; that in that time he had examined 8 or 10 importations;* that the official sample is a wool covering used as a covering for wool in Australia and New

Zealand; that *he thought* that the official sample *would make a container* and that it would hold some wool but not as much as the original bag; that he would not consider the official sample as representative of the shipment as *some of the bags were cut more than the official sample and some were probably not cut so much;* that he did not take the sample; that he could not say whether wool containers could be used more than once.

Ralph D. Kern, called as a witness on behalf of the Government, testified that *he was an examiner of merchandise at Houston and that he had held that position for about eight months;* that he examined three or four samples taken from the shipment involved in the protest; that some of the bags imported were in better condition than the official sample inasmuch as they did not have a hole in the bottom and were not patched up; that the official sample was fairly representative of the shipment; that regular scrap bagging is usually sugar bags, which are smaller than the official sample; that scrap sugar bagging is split completely down one side to the bottom and comes in as a flat piece of burlap; that the goods imported *in his opinion* were bags for the reason that they had to be split to get the wool out and that to make them available as whole bags, *nothing was necessary except to put the wool in and close the bag up*.

The official sample in this case corroborates and fully sustains the testimony on behalf of the importers. The sample is what was once a rectangular shaped bag, the sides of which were 55½ inches long by 26½ inches wide. At the four lines of union of the four sides the bag had been slit 15, 16, 18, and 19 inches, in order to permit the withdrawal of the wool with which the bag was originally packed. In one of the sides of the bag there are 6 small holes, 1 large hole near the bottom, and 1 large triangular hole in the body of the side which has been repaired. In another side there are 11 small holes. The bottom of the bag and each of the sides contain small holes and the bag is much worn in several places.

Practically all of the witnesses are agreed that many of the bags are in worse condition than the sample, *that the merchandise as imported could not be used as bags*, and that the splits would have to be sewn and the bags repaired before they would be fit to be used as bags. The two witnesses produced by the Government were not bag experts, and their testimony was not entitled to the weight which should have been given to the testimony of the witnesses produced by the importer, who were engaged in the manufacture of bags and who had seven years' experience in dealing with bags. Both Renaud and Quarles were employed by American manufacturers of bags, and it can hardly be said that they were prejudiced in favor of the importation of an article which could compete with bags produced by domestic interests.

The merchandise imported is refuse bagging which is no longer susceptible of being used for the purposes of its manufacture. It is, therefore, waste bagging.

Referring to the definitions of waste, the Supreme Court in *Patton* v. *United States*, 159 U. S. 500, 503, said:

The prominent characteristic running through all these definitions (of waste) is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

The judgment of the United States Customs Court is *reversed.*