CHICAGO MICA CO. ET AL. *v.* UNITED STATES (No. 3687)[1]

[1] T. D. 46927.

United States Court of Customs and Patent Appeals, January 29, 1934

Barnes, Richardson & Halstead (Samuel M. Richardson and Joseph Schwartz of counsel) for appellants.

Charles D. Lawrence, Assistant Attorney General (Richard E. FitzGibbon and Ralph Folks, special attorneys, of counsel), for the United States.

[Oral argument December 7, 1933, by Mr. Barnes and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

Importers have here appealed from a judgment of the United States Customs Court overruling their protests against the classification by the Collector of Customs of certain mica, hereinafter more particularly described, imported from Canada in 1929 and 1930, while the Tariff Act of 1922 was in force. The classification was under paragraph 208 of the said act, duty being taken at 4 cents per pound. The paragraph, in full, reads:

PAR. 208. Mica, unmanufactured, valued at not above 15 cents per pound, 4 cents per pound; valued above 15 cents per pound, 25 per centum ad valorem; mica, cut or trimmed, and mica splittings, 30 per centum ad valorem; mica plates, and built-up mica, and all manufactures of mica or of which mica is the component material of chief value, 40 per centum ad valorem; ground mica, 20 per centum ad valorem.

The claim of the protests relied upon is that the merchandise is waste and as such is properly classifiable and dutiable, under paragraph 1457, of said act, which reads:

PAR. 1457. Waste, not specially provided for, 10 per centum ad valorem.

Upon the trial of the case, the importers introduced the evidence of two witnesses called by them, one of them being Mr. Harry L. Forbes, manager of the Canadian company from which the merchandise was purchased, and the other Mr. L. T. Frederick, vice president of the importing company at the time of the importation. Also certain exhibits were introduced in evidence. The Government introduced no testimony.

Mr. Forbes gave testimony as to the origin and production of the imported merchandise. The parts of his testimony, regarded as here material, are to the effect that in preparing ("cobbing") mica, the product as it comes from the mine is sorted as to size, the largest sizes being made into sheets; that the remaining sizes are screened over a screen having openings three quarters of an inch square; that such mica as goes over the screen is sent to the factory, dried, and again passed over a screen of the same size; that employees of the factory

then pick out the imperfect crystals and reduce the thick pieces, after which it is again screened; that all of the mica from which there cannot be obtained pieces at least one inch square is thrown upon a scrap heap; that waste occurs in the mine, in the cobbing shed adjacent the mine, and in the factory where the material is carried from the mine, and that the imported merchandise comes from the scrap heaps, being shipped after being put through a process of screening, drying, and reducing. Exhibit 1 was filed as illustrative of the importation.

The witness further testified that prior to September 22, 1922 (the date upon which the Tariff Act of 1922 went into effect), merchandise like Exhibit 1 was not sold because there was no demand for it, no machine having then been invented for splitting it. He stated that the cheapest mica which he sold was "one by one thumb trim * * * quoted for twenty cents a pound," and that, prior to September 21, 1922, any of the scrap mica sold would not have been sold at more than half a cent a pound, but stated that he received for the imported merchandise at the time of its sale in 1929 and 1930, 14 cents per pound.

The material testimony of Mr. Frederick is to the effect that his firm makes "artificial mica," the ordinary use of which is for electrical insulation; that the merchandise in the condition imported could not be used for electrical insulation; that it must be split into layers less than a thousandth of an inch in thickness, which layers are built together with shellac; that prior to 1926 or 1927 his firm experimented with trimmed mica, splitting it by hand, but that the operation was so expensive as to render the sale of his product difficult; that by experimentation he, at about that time (1926 or 1927), developed a machine for splitting the mica taken from the scrap heaps or dumps, and described the process of the machine in detail, among other things, saying:

* * * when we bought this dump mica, and dryed it and let it flutter through the mesh and as it was fluttering the thin pieces were retarded by the air, and from the steady wetting, a suction drum, and sucked that light mica or separated mica into a screen and then the screen was carried away, and that was the splittings and the heavy pieces that were not separated, had enough weight to carry them past the suction boxes, and they were processed, then I would heat them again and refloat them again, and that is the principle on which our splitting machine is built.

The immediately foregoing described process, as we understand it, is applied to the merchandise after its importation, and the resultant product is then made into articles illustrated by Exhibit 3, capable of use in making electrical insulation articles, such as Exhibit 2, although Exhibit 2 itself is stated to have been made of muscovite mica.

The witness further testified that in the condition imported the merchandise was not dedicated to any particular use or to the making of any definite article; that it could be made into ground mica, and

gave testimony as to different kinds of mica—muscovite and phlogophite—stating that the imported merchandise is known as phlogophite. He testified that Exhibit 1 is not cut mica, trimmed mica, mica splittings, mica plates nor built-up mica, all of which articles are provided for eo nomine in paragraph 208, supra.

The fair conclusion deducible from the testimony, taken as a whole, is that the imported merchandise is material, the like of which, prior to the invention of the splitting machine about 1926 or 1927, had little or no practical use or value—possibly being suitable only for the making of ground mica; that there was little market for it, and that it was mostly consigned to scrap heaps. With the invention of the splitting machine, however, it became practicable to utilize it, and it became a marketable product, having a value, the imported merchandise itself having brought the price of 14 cents per pound.

We think it is also perfectly clear from the record that the eventual uses of merchandise such as that imported are the same, in part at least, as the uses to which larger sizes or fragments of mica may be and are put.

The witness Forbes, when being cross-examined, was shown an article and was asked whether the mica contained therein was not manufactured out of mica such as or similar to that imported. He replied:

I do not know whether it is or not. That mica, your honor, may be made from hand split mica, or may not. It may be made from machine split mica, I do not know.

We quote also specific testimony of the witness Frederick upon cross-examination:

X Q. A very distinct change has taken place in the art as to this merchandise and its manufacture, since you invented the splitting machine, Mr. Fredericks, is that not true?—A. Yes.

X Q. And the fact is that due to your invention and perfection of the splitting machine, you are now able to use merchandise such as or similar to the imported merchandise herein for the manufacture of articles that formerly you used to have to buy split mica for, isn't that true?

\*      \*      \*      \*      \*      \*      \*

The WITNESS. Yes.

There is no contention that the merchandise involved contains any foreign matter, or that it is not pure mica, in all respects the same in that regard as the larger sizes which presumably have greater value.

Apparently, the splitting of it after importation is a process which larger lumps or fragments of mica would have to undergo—such lumps or fragments, for example, as those constituting the "mica, unmanufactured, valued at  \*   \*   \*   above 15 cents per pound," provided for in the same paragraph. At least, there is nothing in the record to indicate otherwise. By reason of differences in size, the splitting process may differ in manner, but the involved para-

graph makes no distinction between unmanufactured micas on account of their sizes or manner of production, and, in the final analysis, the difference in size appears to be the only discernible distinction between the imported merchandise and other micas imported in raw form.

Under this state of facts, we do not think that it may properly be held to have been the intent of Congress that the merchandise at issue should be classifiable as waste.

One of the contentions of appellants' counsel is with respect to the meaning of terms at the date of the enactment of the Tariff Act of 1922. It is insisted that the material then was waste, and it is asserted that—

It is settled that the common meaning of an *eo nomine* designation must be determined as of the date of the enactment of the tariff act (*Hawley & Letzerich et al.* v. *United States*, 19 C.C.P.A. (Customs) 47, T.D. 44892; *Wilbur-Ellis Co. et al.* v. *United States*, 18 C.C.P.A. (Customs) 472, T.D. 44762).

We do not regard what was said in the cases so cited as being applicable to the case at bar. In both these cases the question of chief use of the merchandise there involved was a predominant one, and not the inherent nature of the merchandise. Here the classification is in no wise dependent upon use as such, and the inherent nature of the material was the same in September 1922 as it was in 1929 and 1930. There is no question of commercial designation at issue.

"It is well established that tariff statutes are made for the future as well as for the present." *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T.D. 43294, citing *Pickhardt* v. *Merritt*, 132 U.S. 252.

Under the foregoing rule it has been frequently held, in effect, as it was in the cases cited, that tariff laws embrace articles which may not have been in existence at the time of the passage of those laws but which were later developed. We do not have to turn to the foregoing rule here, however, because mica such as that at bar, was, in fact, in existence at the time of the passage of the Tariff Act of 1922, but it is cited because it would seem, reasoning by analogy, that when, as here, an article which actually existed, though but little availed of, becomes available by reason of processes developed for its utilization, it certainly should be held to be embraced within the paragraph where *eo nomine* designated.

Appellants' brief is an exhaustive and helpful one, many cases dealing with waste, for tariff purposes, being reviewed therein. All these cases we have examined with interest and care. To review them in this opinion would require a prolonged recitation of their facts which, so far as we can see, would not be particularly helpful. After all, the question here is primarily one of fact.

It does seem proper, however, to refer to the definition of waste as laid down by the Supreme Court of the United States in *Patton* v.

406

*United States*, 159 U.S. 500, 503, quoted and followed by this court in the case of *T. E. Ash* v. *United States*, 16 Ct. Cust. Appls. 225, T.D. 42838, and cited in appellants' brief:

> The prominent characteristic running through all these definitions (of waste) is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. ·It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

Applying the foregoing definition to the merchandise at bar, we do not think such merchandise may properly be held to be waste. Instead of being material not "susceptible of being used for the ordinary purposes of manufacture," the record discloses that it is *is* susceptible of such use and *is* so used, and furthermore it discloses that it is merchantable for the exact purposes for which other admittedly merchantable and dutiable mica is suitable.

The judgment of the United States Customs Court is *affirmed*.